IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RYAN HART,<br><br>              Plaintiff,<br><br>v.<br><br>CONNECTED WIRELESS, INC., et al.,<br><br>              Defendants. | MEMORANDUM DECISION AND ORDER<br><br>Case No. 2:17-CV-186-TS<br><br>District Judge Ted Stewart |

This matter is before the Court on Plaintiff Ryan Hart's ("Plaintiff") Post-Evidentiary Briefing Re: Damages. For the reasons discussed below, the Court will grant $97,841.30 in back pay, $50,000 in compensatory damages, and $102,538.50 in attorney's fees. The Court also finds C&C Communications, LLC ("C&C") and Connected Wireless President Anthony Morrison ("Morrison") should be held jointly and severally liable for these damages.

## I. PROCEDURAL AND FACTUAL BACKGROUND

Plaintiff began work as a sales consultant for Connected Wireless Inc.'s ("Connected Wireless") Provo Towne Center store around December 17, 2012.[1] He experienced discrimination based on his disability—in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq*—and left employment on March 19, 2013.[2] On August 30, 2013, Plaintiff filed a Charge of Discrimination against Connected Wireless with the Equal Employment Opportunity Commission ("EEOC") and Utah Antidiscrimination and Labor

---

[1] Docket No. 37 ¶¶ 13–14; Docket No. 91-12, at 2.

[2] *See* Docket No. 72-1, at 2.

Division ("UALD").[3] After undergoing the required administrative process,[4] Plaintiff filed a

complaint against Connected Wireless on January 17, 2017, in the Fourth Judicial District Court

of Utah County.[5] Initially, Connected Wireless participated in the litigation, removing it to

federal court on March 14, 2017,[6] then filing an answer on April 4, 2017.[7] On January 18, 2018,

parties attempted but did not reach settlement.[8] On February 12, 2019, the Court received notice

of Connected Wireless's bankruptcy filing, which stayed proceedings in this Court.[9] On May 24,

2019, Connected Wireless petitioned to dismiss that bankruptcy case as "error."[10] On May 28,

2019, the Court received motions for Connected Wireless's counsel to withdraw[11]—appending a

letter from Morrison stating that Connected Wireless had "ceased operations," that its "corporate

entity has been dissolved by the Utah Division of Corporations and Commercial Code," and that

it therefore "is unable to continue participating in this matter."[12] The Court granted those

motions.[13] On July 19, 2019, Plaintiff filed a Motion to Reopen Case, as the automatic stay from

Connected Wireless's bankruptcy proceedings was lifted July 1, 2019.[14] On September 24, 2019,

---

[3] *Id.*

[4] *See* Docket No. 2-1, at 23–24 (EEOC Notice of Right to Sue, dated October 19, 2016).

[5] *Id.* at 5, 18.

[6] Docket No. 2, at 2.

[7] Docket No. 11. Connected Wireless later submitted an Answer to the Amended Complaint on August 24, 2018. Docket No. 45.

[8] *See* Docket No. 25.

[9] *See* Docket No. 56.

[10] *See* Docket No. 92, at 2.

[11] Docket Nos. 64, 65.

[12] Docket Nos. 64-1, 65-1.

[13] Docket No. 66.

[14] *See* Docket No. 67, at 2; Bankruptcy Case No. 19-20789, Docket No. 23.

this Court ordered Connected Wireless to appoint new counsel within fifteen days.[15] Connected Wireless ignored that order. On October 24, 2019, Plaintiff filed a Motion for Default Judgment.[16] Then on October 29, 2019, this Court granted Plaintiff's Motion to Reopen Case and entered default judgment against Connected Wireless based on its failures to comply with Court Orders or participate in this litigation.[17]

On February 24, 2020, the Court held an evidentiary hearing regarding damages.[18] Connected Wireless did not participate. Plaintiff and his father, Craig Hart, testified concerning Plaintiff's mental health history, the trauma Plaintiff experienced from disability discrimination at Connected Wireless, and the lasting impact of that trauma.[19] According to their accounts, Plaintiff has suffered from anxiety and depression since adolescence.[20] He was also diagnosed with ADHD.[21] However, before working for Connected Wireless, Plaintiff was "extremely motivated" and able to hold down full-time jobs "for years at a time."[22] This included stressful jobs at the Sherriff's Department and at Brent Brown Toyota where he had to make car sales to earn a commission.[23] Plaintiff testified that at Connected Wireless he was initially "meeting and surpassing . . . the goals for not only customer satisfaction, but also . . . sales."[24] Michael

---

[15] Docket No. 76.

[16] Docket No. 80.

[17] *See* Docket Nos. 82, 83.

[18] *See* Docket No. 89.

[19] *See generally* Docket No. 91-4.

[20] *Id.* at 34.

[21] *Id.* at 36.

[22] *Id.* at 27, 35.

[23] *Id.* at 30, 35–36.

[24] *Id.* at 18.

Dunning—Plaintiff's former direct manager at Connected Wireless—verifies this in a signed, undated statement.

> [Plaintiff] became a valuable asset to the company as he mastered the technical side of our operations and provided excellent customer service. He demonstrated a natural ability to make customers feel important, supported, and confident in the services that Connected Wireless provided. I was impressed with how patient and personable [Plaintiff] was with customers as he helped them work through their frustrations with service issues. He is a good problem solver. He became eligible for bonuses after his training period and started earning them because of his good work. [Plaintiff] was pleasant to work with, and tried hard to get along with other employees, including one who was quite difficult to manage. He also assured the store was neat and orderly. I thought that his leadership abilities and people skills would eventually land him in a management position.[25]

However, Plaintiff's progression at work was interrupted when management began requiring sales consultants to memorize a verbatim script.[26] Plaintiff worked on the script, with his father's help, but could not commit it to memory due to his learning disability.[27] Plaintiff's father reports this frustration took an alarming mental toll on Plaintiff.[28] Plaintiff discussed his need for ADA accommodation five times with individuals in Connected Wireless management— including Morrison, HR manager Gary Rhay, District Manager Brian Rhay—who is also Gary Rhay's son—and Michael Dunning.[29] Plaintiff testified that Brian Rhay "brushed me off."[30] Michael Dunning reports:

> [o]n at least two occasions during February to March 2013 time frame, I heard Brian brush off [Plaintiff's] explanation of his disability and make threatening statements about his employment if he did not memorize the script. [Plaintiff] asked Brian on those occasions if there was a way he could be exempt from the requirement

---

[25] Docket No. 91-12, at 2.

[26] *See* Docket No. 91-4, at 41.

[27] *Id.*; *see also* Docket No. 91-10, at 2.

[28] Docket No. 91-4, at 41.

[29] *Id.* at 18–19.

[30] *Id.* at 19.

because of his disability if he covered the main points of the script in his own words. Brian told [Plaintiff] he was required to memorize the script like everyone else.[31]

On March 14, 2013, Plaintiff emailed Morrison regarding his disability, requesting accommodation and explaining that Brian Rhay had threatened him with termination if he could not memorize the script despite his disability.[32] Morrison forwarded the email to Gary Rhay the following day but does not appear to have responded to Plaintiff.[33] On March 18, 2013, Gary Rhay emailed Plaintiff requesting documentation of his learning disability.[34] On March 19, 2013 at 12:50 p.m., Plaintiff responded with an email attaching a medical letter from clinical neuropsychologist, Dr. Erin Bigler, Ph. D.[35] Her note, also dated March 19, 2013, states that Plaintiff "has a long-standing history of learning disability" that "makes it very challenging to memorize verbatim material."[36] Dr. Bigler requests "that accommodations be given to him for information that requires memorization."[37] Gary Rhay forwarded the email to his son, Brian Rhay, on March 19, 2013 at 3:17 p.m.[38] Morrison later claimed documentation of Plaintiff's disability was "received" only after Plaintiff left his employment.[39] This is not accurate. However, it is plausible Morrison discovered the medical letter only after Plaintiff left

---

[31] Docket No. 91-12, at 2–3.

[32] Docket No. 91-8, at 2–3.

[33] *Id.* at 2.

[34] Docket No. 91-9, at 2.

[35] *Id.* Plaintiff's email states "[a]ttached is the documentation that you are . . . looking for." Plaintiff testified that the attachment referred to here was the medical letter from Dr. Bigler. Docket No. 91-4, at 57; *see* Docket No. 91-10.

[36] Docket No. 91-10, at 2.

[37] *Id.*; *see also* Docket No. 91-4, at 20–23, 48, 56–57.

[38] Docket No. 91-8, at 2.

[39] *See* Docket No. 91-11, at 2 (Morrison email response to Plaintiff's former counsel, Dallan Flake).

employment, as Plaintiff emailed it to Gary Rhay at 12:50 p.m. on March 19, 2013, and resigned sometime later that day.[40]

After sending the medical letter to his employer, Plaintiff got a ride with his father to work. [41] In the car, Plaintiff placed a phone call to Gary Rhay, confiding that he did not want to "stir the waters" but that he had a child and family and was worried about his job.[42] Gary Rhay responded that "you've already stirred the waters" and hung up on him.[43] Plaintiff was stunned and feared he would be fired that day at work.[44] He struggled to get out of the car.[45] He arrived to find Brian Rhay waiting for him.[46] Michael Dunning shared Plaintiff's perception that Brian was there "to make good on his prior threats to terminate [Plaintiff's] employment."[47] Plaintiff describes Brian Rhay as a "bully" who "touted himself as the vice president of the company."[48] In the conversation that immediately followed—which Plaintiff recorded—Brian told Plaintiff:

> No one talked to me about [your disability] because it doesn't matter. Either you can do the job or you can't do the job. It's a right to work state. . . . Your disabilities and stuff like that don't matter. Now, I'm sorry, they don't. You know there's no state law protecting you in a right to work state against a memorization disability. Unless you can prove that disability, and it's on file with the state.[49]

---

[40] Docket No. 91-9, at 2; Docket No. 91-4, at 48 (Craig Hart relaying that Plaintiff submitted the medical letter prior to termination of his employment).

[41] *See* Docket No. 91-4, at 19.

[42] *Id.*

[43] *Id.*

[44] *Id.* at 49–50 (Plaintiff's father testified, "[Plaintiff] was stunned . . . . he said, 'I don't – I don't know if I want to go to work today because when I go in there, I'll bet I'm going to get fired'").

[45] *Id.* at 50.

[46] *Id.* at 27–28, 50.

[47] Docket No. 91-12, at 3.

[48] Docket No. 91-4, at 27–28.

[49] *Id.* at 28; Docket No. 91-7, at 2.

At the point of this conversation, it is unclear whether Brian Rhay had seen Plaintiff's medical letter forwarded to him at 3:17 p.m. that day.[50] In a July 3, 2014 interview with a UALD investigator, Brian Rhay denied ever having made the above recorded statement.[51]

With that, Plaintiff resigned on March 19, 2013, feeling certain he would be fired and lose his bonus unless he did so.[52] Plaintiff explains that this experience "[m]ade me feel worthless, like I didn't matter, that I had no options."[53] "And when I was told my disability didn't matter and – amongst other things by Mr. Rhay, something broke inside of me."[54] As a result, Plaintiff lost over twenty pounds within a couple weeks.[55] He experienced significant depression, visited medical professionals, started new anti-anxiety and anti-depression medications.[56] He explains, "it rocked my world. And it has affected me in a great way when it comes to my confidence of holding down a job or getting a job and being treated differently."[57] Plaintiff experienced severe headaches, chest pains, and insomnia.[58] He started having panic attacks for the first time, which came when he tried to interview for a new job.[59] When he did manage to get a new job, Plaintiff reports "I couldn't handle it," and it lasted only a couple weeks.[60] His depression jumped from a manageable 3–4 on the pain scale, before the events at

---

[50] *See* Docket No. 91-8, at 2.

[51] Docket No. 91-14, at 3.

[52] Docket No. 91-4, at 49–50; Docket No. 72-1, at 2.

[53] Docket No. 91-4, at 29.

[54] *See id.* at 24.

[55] *Id.* at 29.

[56] *See id.*

[57] *Id.* at 30.

[58] *Id.* at 42.

[59] *Id.* at 30–31.

[60] *Id.* at 31, 45.

Connected Wireless, to a 7–9.[61] Plaintiff's anxiety became "crippling," and at times he could not get out of bed for days.[62] He experienced several hospitalizations, "on average about every other month since this event, for something major," each "humiliating and costly."[63] Plaintiff has also required some 80 to 100 sessions with psychiatrists over the past seven years.[64]

## II. DISCUSSION

### A. DAMAGES

Plaintiff requests $97,841.30 in back pay,[65] $200,000 in compensatory damages for mental anguish, emotional pain and suffering, and loss of enjoyment of life,[66] $34,236.55 in medical expenses,[67] $200,000 in punitive damages,[68] and $102,538.50 in attorney fees.[69] Each category of damages is addressed below.

### 1. Back Pay

Plaintiff requests $97,841.30 in back pay.[70] The Tenth Circuit has held that for Title VII damages, which mirror those under the ADA,[71] "[t]ypically, back pay is calculated from the date of wrongful termination to the end of trial."[72] However, "[a]n unemployed or underemployed

---

[61] *Id.* at 32.

[62] *Id.* at 32, 45.

[63] *Id.* at 31, 40.

[64] *See id.* at 24–25.

[65] *See* Docket No. 91, at 4.

[66] *See id.* at 7–8.

[67] *See id.* at 11.

[68] *See id.* at 12.

[69] *See id.* at 25.

[70] *See id.* at 4.

[71] *See* 42 U.S.C.A. § 12117(a). (providing that enforcement "powers, remedies, and procedures" under the ADA mirror those under Title VII of the Civil Rights Act).

[72] *Zisumbo v. Ogden Reg'l Med. Ctr.*, 801 F.3d 1185, 1203 (10th Cir. 2015).

claimant, like all other Title VII claimants, is subject to the statutory duty to minimize damages," which "requires the claimant to use reasonable diligence in finding other suitable employment."[73] Indeed, "[a]lthough the unemployed or underemployed claimant need not go into another line of work, accept a demotion, or take a demeaning position, he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied."[74]

Plaintiff presents evidence that he used reasonable diligence to find other suitable employment.[75] With the help of his supportive family and therapist, he fought through panic attacks to attend job interviews and obtained employment but was unable to maintain it due to mental health.[76] No evidence has been presented that Plaintiff was offered and refused "substantially equivalent" work.

Plaintiff arrives at the sum of $97,841.30 through the following calculation: his base salary while at Connected Wireless was $3,359.46 for 443.51 hours worked.[77] Plaintiff also received commissions of $878.40, bringing gross earnings up to $4,339.36.[78] This amounts to a roughly $9.78 per-hour wage. Plaintiff calculates that—based on an expectation to work 40 hours per week and an average of 50 work weeks per calendar year—he likely would have worked an average of 2,000 hours per year, equaling earnings of $19,568.26 per year.[79] Plaintiff

---

[73] *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982).

[74] *Id.* at 231–32 (internal citations omitted).

[75] *See* Docket No. 91-4, at 30–31.

[76] *See id.*

[77] *See* Docket No. 91-3, at 2; Docket No. 91, at 6 n.1 (noting that Plaintiff calculates he worked 443.51 total hours based on a 40-hour-per week estimation where payroll records did not indicate specific hours).

[78] *See* Docket No. 91-3, at 2.

[79] *See* Docket No. 91, at 6.

requests back pay for five years.[80] His constructive termination fell in March 2013,[81] and this Court entered default judgment for Plaintiff on October 29, 2019[82]—nearly 6.5 years later. However, Plaintiff offers $97,841.30 covering five years as a "reasonable and conservative estimate" that "does not consider increases in bonuses, commissions, pay raises, or promotions that [Plaintiff] would likely have received."[83]

There is no need to deduct Social Security income from backpay here since Plaintiff did not start receiving those benefits until April 2018—more than five years after his constructive discharge. There is also no need to bookend backpay in 2015, when Connected Wireless claimed it went out of business.[84] As will be discussed in more detail below, Plaintiff has provided evidence that Connected Wireless remains operational,[85] and therefore accrual of backpay after 2015 is appropriate.

The Court finds that Plaintiff exercised reasonable diligence to mitigate his damages and that an award of $97,841.30 in back pay to cover five years from March 2013 to March 2018 is reasonable.

---

[80] *See id.* at 7.

[81] See Docket No. 72-1, at 2 (Plaintiff's Charge of Discrimination, attesting to constructive termination on March 19, 2013, filed with UALD and EEOC).

[82] Docket No. 83.

[83] *See* Docket No. 91, at 6–7.

[84] *See e.g.*, Docket No. 92-2, at 3 (letter from Connected Wireless counsel representing that the company "sold all of its assets in March 2015 and is no longer a registered business").

[85] Docket Nos. 91-5, 92-12, 91-4, at 9–10 (providing commercial listings, screenshots, and searches revealing ongoing store operations for Connected Wireless and testimony from Plaintiff that he physically visited the Connected Wireless store in Valley Fair Mall and confirmed with employees that it was "a Connected Wireless store" within two months prior to the February 24, 2020 evidentiary hearing).

2.  Compensatory Damages

Plaintiff seeks $200,000 in compensatory damages.[86] Under the ADA, compensatory

damages are capped depending on the size of the discriminating company.[87]

> The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party
>
> (A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;
>
> (B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000; and
>
> (C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and
>
> (D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.[88]

The statute provides, and courts have reiterated, that the relevant cap applies to the combined

total for both compensatory and punitive damages.[89] It does not, however, include back pay.[90] In

---

[86] Docket No. 91, at 7–8.

[87] 42 U.S.C.A. § 1981a(b)(3).

[88] *Id.*

[89] *Id.*; *see also Hogan v. Bangor & Aroostook R.R. Co.*, 61 F.3d 1034, 1037 (1st Cir. 1995) (upholding the district court's reading of 42 U.S.C.A. § 1981a(b)(3) as indicating a cap on damages for the combined sum of compensatory and punitive damages, noting "[t]he statute is clear on its face that the sum of compensatory damages (including its various components) and punitive damages shall not exceed [the relevant statutory cap]").

[90] *See* 42 U.S.C.A. § 1981a(b)(2).

addition, courts analyzing the issue have interpreted "current" to indicate the timeframe when the discrimination occurred—not when judgment was rendered.[91]

In his Amended Complaint, Plaintiff states that around the time of the discrimination, there were over fifty employees in Connected Wireless's Provo and Orem stores.[92] Connected Wireless did not dispute this number.[93] Given the evidence before the Court concerning Connected Wireless's size around March 2013, Connected Wireless falls in the range of "more than 14 and fewer than 101 employees," with a statutory cap of $50,000 for compensatory and punitive damages.[94] Plaintiff's argument that the statutory cap should be higher lacks sufficient evidentiary support.

Compensatory damages under the ADA are available only upon a showing of intentional discrimination.[95] As summarized above, the record reflects that Plaintiff disclosed his disability and need for accommodation to several members of management at Connected Wireless and

---

[91] *See e.g.*, *Hernandez-Miranda v. Empresas Diaz Masso, Inc.*, 651 F.3d 167, 170 (1st Cir. 2011) ("We interpret the statutory phrase 'current' calendar year in § 1981a(b)(3) to refer to the time period of the discrimination."); *Depaoli v. Vacation Sales Assocs., L.L.C.*, 489 F.3d 615, 621–22 (4th Cir. 2007) (upholding district court's interpretation that the "current or preceding calendar year" language in § 1981a(b)(3) refers to the year when the legal violation was committed); *Vance v. Union Planters Corp.*, 279 F.3d 295, 297 (5th Cir. 2002) (noting that in the Title VII context, "[f]or purposes of this statute, we have held that the 'current year' refers to the year in which the discriminatory act took place, not the year of judgment") (citation omitted).

[92] *See* Docket No. 37 ¶ 19.

[93] *See* Docket No. 45 ¶ 19.

[94] 42 U.S.C.A. § 1981a(b)(3).

[95] *See* 42 U.S.C.A. § 1981a(a)(1) ("In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 [42 U.S.C. 2000e-5, 2000e-16] against a respondent who engaged in unlawful intentional discrimination . . . the complaining party may recover compensatory and punitive damages . . ."); *Hans v. Bd. of Shawnee Cty. Comm'rs*, 775 F. App'x 953, 956 (10th Cir. 2019) (reviewing and agreeing with other circuit holdings that plaintiff can recover compensatory damages only after establishing intentional discrimination).

eventually provided documentation of his disability from a medical professional.[96] However, far from working to accommodate him, Connected Wireless's management treated Plaintiff with a hostility that has profoundly impacted his physical and mental wellbeing for years since.[97] The Court finds Plaintiff has met his burden of establishing that Connected Wireless intentionally discriminated against him based on his disability.

   a. *Emotional Distress / Pain & Suffering*

Plaintiff requests $200,000 in damages related to mental anguish, emotional pain and suffering, and loss of enjoyment of life,[98] which fall under compensatory damages.[99] As noted above, the applicable statutory maximum for compensatory and punitive damages here is $50,000.

According to the Third Circuit, "[t]o recover emotional damages a plaintiff must show 'a reasonable probability rather than a mere possibility that damages due to emotional distress were in fact incurred [as a result of an unlawful act].'"[100] Testimony from Plaintiff and his father establish a reasonable probability that Plaintiff's emotional distress stemmed from Connected Wireless's unlawful discrimination. Plaintiff and his father testified at length about the anguish Plaintiff experienced in the aftermath of requesting accommodation at Connected Wireless. Plaintiff testified that he felt "worthless, like I didn't matter, that I had no options," and this

---

[96] *See* Docket No. 91-4, at 18–23, 48, 56–57; Docket No. 91-10, at 2.

[97] *See e.g.*, Docket No. 91-4, at 19, 25, 27–28.

[98] Docket No. 91, at 7–8.

[99] *See e.g., Tyler v. City of Manhattan*, 118 F.3d 1400, 1402–03 (10th Cir. 1997) (treating "emotional distress" under the ADA as a claim for compensatory damages).

[100] *Gagliardo v. Connaught Labs., Inc.*, 311 F.3d 565, 573 (3d Cir. 2002) (quoting *Spence v. Bd. of Educ.,* 806 F.2d 1198, 1201 (3d Cir. 1986)) (second alteration in original).

caused a great deal of depression.[101] Craig Hart testified about his son's painful mental decompensation after departing Connected Wireless, including "escalation of all of the really serious psychiatric and medical conditions, the psychosomatic conditions that he experienced that were not present before Connected Wireless."[102] Regarding the connection between this emotional distress and Connected Wireless's conduct, Plaintiff testified that his depression and anguish stemmed from his experience at Connected Wireless, particularly his conversation with Brian Rhay.[103] Plaintiff is a credible authority on the genesis of his heightened depression, anxiety, and pain. His testimony clearly ties this suffering to the preceding interactions at Connected Wireless. The Court finds Plaintiff has met his burden of establishing a reasonable probability that his emotional distress resulted from Connected Wireless's unlawful discrimination. In addition, Plaintiff's father testified that $200,000 was a reasonable sum to compensate the emotional trauma his son had experienced.[104] The Court finds this testimony provides, at the very least, a basis for awarding the statutory cap of $50,000 in compensatory damages.

    *b.  Medical Expenses*

Plaintiff requests "$34,236.55 in medical expenses that are causally related to Connected Wireless's discriminatory acts."[105] Medical expenses fall under compensatory damages, which include "future pecuniary losses."[106] EEOC guidance specifies that "out-of-pocket expenses

---

[101] Docket No. 91-4, at 29.

[102] *Id.* at 40.

[103] *See e.g.*, *id.* at 31.

[104] *Id.* at 50–51.

[105] Docket No. 91, at 11.

[106] 42 U.S.C.A. § 1981a(b)(3).

caused by the discrimination (such as . . . medical expenses)" fall under compensatory damages.[107] As the Court has granted the $50,000 statutory maximum for compensatory damages, it cannot grant additional medical expenses. However, these medical expenses provide further support for awarding the statutory maximum amount.

3. Punitive Damages

The Court has granted the $50,000 statutory maximum for combined compensatory and punitive damages. As such, Plaintiff is not eligible for further punitive damages.[108] Even if this were not the case, however, the Court is not convinced Plaintiff has cleared his evidentiary hurdle.

4. Attorney Fees

Plaintiff seeks $102,538.50 in attorney fees.[109] The ADA provides that "[i]n any action . . . . commenced pursuant to this chapter, the court . . . in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs."[110] Concerning ADA plaintiffs, the Tenth Circuit has instructed that "[t]he primary principle which we must apply is that a 'prevailing plaintiff should ordinarily recover an attorney's fee unless special

---

[107] *See e.g.*, Remedies for Employment Discrimination, EEOC ("Compensatory damages pay victims for out-of-pocket expenses caused by the discrimination (such as costs associated with a job search or medical expenses) and compensate them for any emotional harm suffered (such as mental anguish, inconvenience, or loss of enjoyment of life)."). https://www.eeoc.gov/remedies-employment-discrimination (last visited Oct. 9, 2020); *see also Marinelli v. Potter*, 661 F. Supp. 2d 69, 83 (D. Mass. 2009) (finding that medical expenses are generally included in the category of compensatory damages for Age Discrimination in Employment Act purposes).

[108] *See* 42 U.S.C.A. § 1981a(b)(3).

[109] Docket No. 91, at 25.

[110] 42 U.S.C.A § 12205.

circumstances would render such an award unjust.'"[111] No such circumstances have been presented, nor are any apparent, here. Plaintiff is the prevailing party because the Court granted him default judgment as to Connected Wireless on October 29, 2019.[112]

The "fee the trial court establishes must be reasonable,"[113] and "the most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."[114] "The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed."[115]

As evidence for requested attorney fees, Plaintiff provides documentation from his current attorneys at Sumsion Business Law and his previous attorney Dallan Flake.[116] Sumsion Business Law attorney Cameron Christensen provides an affidavit, appending invoices for $90,538.50 in legal fees with hourly rates ranging from $90 to $345 depending on the attorney.[117] Dallan Flake's affidavit attests to an hourly rate of $250 multiplied by 48 hours of work, totaling $12,000 in legal fees.[118] The Court finds these fees reasonable and will award the combined total of $102,538.5 in attorney fees.

---

[111] *Roe v. Cheyenne Mountain Conference Resort, Inc.* 124 F.3d 1221, 1232 (10th Cir. 1997) (quoting *Hensley v. Eckerhart,* 461 U.S. 424, 429 (1983)).

[112] Docket No. 83.

[113] *Brown v. Phillips Petroleum Co*., 838 F.2d 451, 453 (10th Cir. 1988).

[114] *Id.* (quoting *Hensley,* 461 U.S. at 434).

[115] *Hensley,* 461 U.S. at 433.

[116] Docket No. 92-6, at 2–3; Docket No 94-2.

[117] Docket No. 92-6, at 2–17.

[118] Docket No. 94-2, at 3.

B.  ENTITIES AND INDIVIDUALS LIABLE FOR DAMAGES

Plaintiff argues Connected Wireless, C&C, and Morrison should be held jointly and severally liable for damages.[119] "On motion or on its own, the court may at any time, on just terms, add or drop a party,"[120] "even after judgment has been rendered."[121] Plaintiff was not previously aware of C&C's identity as a successor company but nonetheless asserted claims against it in the Amended Complaint as "Does 1–10."[122] In addition, "[i]f an alter-ego claim is asserted in conjunction with the underlying federal cause of action, the latter may provide the basis for ancillary jurisdiction over the alter-ego claim."[123] Therefore, although C&C and Morrison have not been formally joined to this action, the Court may appropriately name them in the judgment through its ancillary jurisdiction,[124] which includes "the power to conduct proceedings necessary to protect and give effect to its judgments."[125] The applicable theories of liability are discussed below.

---

[119] *See* Docket No. 91, at 27–40.

[120] Fed. R. Civ. P. 21.

[121] *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 832 (1989).

[122] *See* Docket No. 37 ¶ 5 ("Upon information and belief, Defendants Does 1–10 are individuals or corporations that purchased the assets used in Connected Wireless.").

[123] *Ellis v. All Steel Constr., Inc.*, 389 F.3d 1031, 1033 (10th Cir. 2004).

[124] *See id.* (providing that "[i]t is only when an alter-ego claim is asserted in a separate judgment-enforcement proceeding that *Peacock* requires an independent basis for federal jurisdiction"); *Privacy–Assured Inc. v. AccessData Corp., Ltd.*, No. 2:14-cv-722-CW, 2017 WL 2963435, at *2 (D. Utah July 11, 2017) (unpublished) (outlining what a plaintiff must show to establish a court has subject matter jurisdiction to add a judgment debtor under an alter ego theory of liability).

[125] *Sandlin v. Corp. Interiors Inc.*, 972 F.2d 1212, 1216 (10th Cir. 1992).

1.  C&C is Liable as Connected Wireless's Successor

"The general rule is that where one corporation sells or otherwise transfers all of its assets

to another corporation, the latter is not liable for the debts and liabilities of the transferor."[126]

There are, however, four recognized exceptions:

> (1) Where the purchaser expressly or impliedly agrees to assume such debts; (2) where the transaction amounts to a consolidation or merger of the corporations; (3) where the purchasing corporation is merely a continuation of the selling corporations; and (4) where the transaction is entered into fraudulently in order to escape liability for such debts.[127]

Courts have found exceptions (2) and (3) to be so similar, they warrant consideration as a single

exception.[128] The Tenth Circuit, for example, does not distinguish between them in *Trujillo v.*

*Longhorn Manufacturing Co.*[129]

Plaintiff argues each exception applies. The Court finds C&C is liable under combined

exceptions (2) and (3) as well as exception (4).

> *a. There is "substantial continuity" of identity to hold C&C liable.*

The "de facto consolidation or merger" and "mere continuation" theories of successor

liability—exceptions (2) and (3)—have been broadened by the concept of "substantial

continuity" developed in a string of Supreme Court labor relations cases.[130] Plaintiff argues that

---

[126] *Sheedy v. BSB Properties, LC*, No. 2:13-cv-290-JNP, 2016 WL 10537388, at *2 (D. Utah Jan. 27, 2016) (unpublished) (quoting *R.J. Enstrom Corp. v. Interceptor Corp.*, 555 F.2d 277, 281 (10th Cir. 1977)).

[127] *Trujillo v. Longhorn Mfg. Co., Inc.*, 694 F.2d 221, 224 (10th Cir. 1982) (quoting *W. Tex. Ref. & Dev. Co. v. Comm'r of Internal Revenue*, 68 F.2d 77, 81 (10th Cir. 1933)).

[128] *See e.g.*, *Cargo Partner AG v. Albatrans, Inc.*, 352 F.3d 41, 45 n. 3 (2d Cir. 2003) ("Some courts have observed that the mere-continuation and de-facto-merger doctrines are so similar that they may be considered a single exception.") (collecting cases).)

[129] *Trujillo*, 694 F.2d at 223–25.

[130] *See United States v. Mexico Feed & Seed Co., Inc.*, 980 F.2d 478, 487–88 (8th Cir. 1992) (Noting that "[t]he 'substantial continuity' test originated with a line of Supreme Court labor relations cases" finding that, in certain situations, a purchasing corporation "may be

C&C should be held liable under the theory that it shares "substantial continuity" of identity with Connected Wireless. To analyze such liability, the Tenth Circuit has adopted the *MacMillan* factors,[131] which include:

> 1) whether the successor company had notice of the charge, 2) the ability of the predecessor to provide relief, 3) whether there has been a substantial continuity of business operations, 4) whether the new employer uses the same plant, 5) whether he uses the same or substantially the same work force, 6) whether he uses the same or substantially the same supervisory personnel, 7) whether the same jobs exist under substantially the same working conditions, 8) whether he uses the same machinery, equipment and methods of production and 9) whether he produces the same product.[132]

The Tenth Circuit has not articulated an approach for weighing the above factors, noting that "the 'nature and extent of [successor] liability is subject to no formula, but must be determined upon the facts and circumstances of each case.'"[133] In *Trujillo*, however, the court upheld a district court's finding that a corporation was a mere or substantial continuation of the selling corporation based on the *MacMillan* factors and drawing from the reasoning of *Brown v. Evening News Association*.[134] In *Brown*, the Eastern District of Michigan explained:

> No one of these factors is controlling; the court must look at all of them along with any others that present themselves in the case before it, and it must make its decision by balancing the interests of the plaintiff and the national policy of abhorrence toward employment discrimination against the interest of the successor . . .[135]

---

considered in privity with its predecessor for purposes of [unfair labor practices]'") (quoting *Golden State Bottling, Co., Inc. v. NLRB*, 414 U.S. 168, 180 (1973)).

[131] *Trujillo*, 694 F.2d at 225 ("The reasoning of the Sixth Circuit is convincing and we endorse the application of the *MacMillan* factors in analyzing a successor corporation's liability under Title VII."); *see also* 42 U.S.C.A. § 12117(a).

[132] *EEOC v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1094 (10th Cir. 1974) (collecting cases).

[133] *Trujillo*, 694 F.2d at 225 (quoting *MacMillan*, 503 F.2d at 1092) (alteration in original).

[134] *See id.* at 224; *Brown v. Evening News Ass'n*, 473 F. Supp. 1242, 1245 (E.D. Mich. 1979).

[135] *Evening News Ass'n*, 473 F. Supp. at 1245.

In addition, the *Brown* court noted that "[f]actors (4) through (9) are best considered sub-parts of factor (3). They have been appropriately termed the 'sameness' factors."[136]

      1)  Factor 1: whether the successor company had notice of the charge

The Court lacks definitive information regarding this factor. Plaintiff contends C&C "either knew, or should have known, that the charge of discrimination was filed" based on circumstantial evidence because the 2013 charge date came long before the 2015 date when C&C purchased Connected Wireless.[137] Certainly Connected Wireless was well aware of Plaintiff's case before transferring assets to C&C, as a UALD investigator interviewed District Manager Brian Rhay regarding the matter on July 3, 2014.[138] C&C's due diligence process would likely have revealed Plaintiff's charge. However, the Court cannot fully ascertain what information C&C had in 2015 based on the one-line Bill of Sale in evidence.[139] The Bill of Sale references further details in the Purchase Agreement.[140] However, even the document Plaintiff references as the "Purchase Agreement"[141] does not shed any light on whether C&C had notice of Plaintiff's charge of discrimination.

---

[136] *Id.*

[137] Docket No. 91, at 30–31. Plaintiff's original Charge of Discrimination against Connected Wireless was dated August 30, 2013, and the Bill of Sale conveying Connected Wireless's assets to C&C was effective March 1, 2015. Docket No. 72-1, at 2; Docket No. 92-7, at 2.

[138] Docket No. 91-14.

[139] *See* Docket No. 92-7, at 2.

[140] *See id.*

[141] This document—Docket No. 92-8, at 2–3—describes the transfer and sale of Connected Wireless assets to C&C. While it meets the description of a purchase agreement, it defines itself as the "Assignment Agreement," and it is not clear whether this is the document referenced in the Bill of Sale.

2)  Factor 2: whether Connected Wireless can provide relief

This factor weighs for holding C&C liable. Addressing this factor, the *MacMillan* court explained, "[t]he primary concern . . . is to provide the discriminatee with full relief."[142] Therefore, the court in *Brown* found that "the job of the court is to determine whether the new employer is necessary, in the factual situation that is presented, to the formation of a 'realistic remedy' for the discriminatee."[143] In *Trujillo*, the Tenth Circuit found a successor corporation liable even though the original corporation—where the discrimination occurred—remained viable and recently sold assets for a hefty sum.[144] The court reasoned that it was not presented with information concerning the original corporation's liabilities and ability to fully pay the judgment.[145] With the goal of providing the most complete relief possible, therefore, the court held the successor corporation liable.[146] The same is true here, to an even greater degree. Information before the Court regarding Connected Wireless's solvency suggests Connected Wireless cannot provide complete relief to Plaintiff.[147] "Failure to hold a successor employer liable for the discriminatory practices of its predecessor could emasculate the relief provisions of

---

[142] *MacMillan*, 503 F.2d at 1092.

[143] *Evening News Ass'n*, 473 F. Supp. at 1247.

[144] *Trujillo*, 694 F.2d at 225 (noting that the judgment amount was only four percent of the $425,000 price for which the original company recently sold assets).

[145] *Id.*

[146] *Id.*

[147] *See e.g.,* Docket No. 71-1 (correspondence between Connected Wireless President Morrison and Plaintiff, in which Mr. Morrison describes Connected Wireless as "a defunct company"); Docket Nos. 64-1, 65-1 (Motions to withdraw as attorney, noting that Connected Wireless "has ceased operations and its corporate entity has been dissolved by the Utah Division of Corporations and Commercial Code").

Title VII [or the ADA] by leaving the discriminatee without a remedy or with an incomplete remedy."[148] Therefore, this factor strongly favors holding C&C liable.

>    3) Factors 3–9: whether there is adequate "sameness" between Connected Wireless and C&C

These factors also weigh for C&C liability. There is evidence before the Court of substantial continuity of business operations from Connected Wireless to C&C. Plaintiff testified that he physically visited the Connected Wireless store at Valley Fair Mall in West Valley City, Utah within two months before the February 24, 2020 hearing.[149] He asked employees "[i]s this a Connected Wireless store?" and was told "yes."[150] The Connected Wireless store at the Provo Towne Centre continued operations as a C&C store[151] after Connected Wireless supposedly "ceased all operations in approximately 2015."[152] LinkedIn profiles for employees show that several of them—including supervisory personnel like Morrison and HR Manager Gary Rhay— represent that they currently work for Connected Wireless or that they worked there long after 2015.[153] This does not appear to be a matter of negligent updating. For example, one employee lists job updates as recently as 2019, and he documents his Connected Wireless employment as continuing until May 2016—well after the company allegedly closed shop in 2015.[154] These profiles also show that at least one employee transitioned from being a District Manager at

---

[148] *MacMillan*, 503 F.2d at 1091.

[149] Docket No. 91-4, at 9–10.

[150] *Id.*

[151] *See* Docket No. 92-12, at 2–4.

[152] Bankruptcy Case No. 19-20789, Docket No. 14, at 1–2.

[153] *See* Docket No. 92-13, at 2–11 (Profiles for Morrison, Gary Rhay, and multiple other staff members list employment with Connected Wireless continuing to the present. Others list it ending sometime after 2015).

[154] *Id.* at 7.

Connected Wireless in Tulsa, Oklahoma until February 2015 to being a District Manager at C&C also in Tulsa in March 2015.[155] This employee's transition without pause from Connected Wireless to C&C suggests that not only did both positions carry the same title, their substance was likely very similar. Further, C&C began business at Connected Wireless's old store locations after taking over Connected Wireless's Authorized Representative Agreement with Sprint in April 2015 to sell Sprint products and services.[156] This shows C&C sells the same products and services as Connected Wireless did. These collective facts point to a continuation of the same business with a different name. Therefore, the Court finds that the sale of assets from Connected Wireless to C&C, and the subsequent continuation of business operations, establishes substantial continuity of identity. As the Tenth Circuit found in *Trujillo*, this is a case where "'the equities . . . favor successor liability because it is the successor who has benefited from the discriminatory employment practices of its predecessor.'"[157]

> b. *Connected Wireless fraudulently transferred assets to C&C to avoid liability, and C&C should be held liable.*

Exception (4) also provides a basis for holding C&C liable. There is evidence before the Court that the transfer of assets from Connected Wireless to C&C was fraudulently done to avoid liability. As Connected Wireless chose not to participate in this litigation, the Court is presented with no contrary evidence. Still, the Court must assess whether Plaintiff's evidence shows by a preponderance of the evidence that Connected Wireless fraudulently transferred assets to C&C.[158]

---

[155] *Id.* at 10–11.

[156] Docket No. 92-8, 4–75.

[157] *Trujillo*, 694 F.2d at 225 (quoting *MacMillan*, 503 F.2d at 1092).

[158] The operative 2015 version of the statute does not specify the burden. However, in 2017, the Utah Uniform Fraudulent Transfer Act was renamed the Uniform Voidable

This analysis under Utah's Uniform Fraudulent Transfer Act ("UFTA") provides that:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . with actual intent to hinder, delay, or defraud any creditor of the debtor . . .[159]

The statute provides that a court analyzing whether a debtor had "actual intent" to hinder, delay, or defraud any creditor may consider the following non-exhaustive factors:

> To determine "actual intent" under Subsection (1)(a), consideration may be given, among other factors, to whether:
> (a) the transfer or obligation was to an insider;
> (b) the debtor retained possession or control of the property transferred after the transfer;
> (c) the transfer or obligation was disclosed or concealed;
> (d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (e) the transfer was of substantially all the debtor's assets;
> (f) the debtor absconded;
> (g) the debtor removed or concealed assets;
> (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> (i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> (j) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
> (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.[160]

As to these factors, the Court has the following information:

---

Transactions Act, amended, and renumbered to Utah Code Ann. § 25-6-101 *et seq*. This updated statute specifies that "[a] creditor making a claim for relief under Subsection (1) has the burden of proving the elements of the claim for relief by a preponderance of the evidence." Utah Code Ann. § 25-6-202(3).

[159] Utah Code Ann. § 25-6-5(1) (2015).

[160] *Id.* at § 25-6-5(2) (2015).

(d) Notice: Connected Wireless was on notice of Plaintiff's potential suit at least by July 3, 2014, when a UALD investigator interviewed Brian Rhay.[161] This was before the March 1, 2015 asset transfer.[162]

(e) Substantially All Assets: The Bill of Sale transferring assets from Connected Wireless to C&C specifies that it covers "all Assets of Connected Wireless."[163] Counsel for Connected Wireless wrote to Plaintiff on November 1, 2017, stating, "[e]ven if this case goes to trial and [Plaintiff] prevails, he will not be able to recover any damages from Connected Wireless. The company sold all of its assets in March 2015 and is no longer a registered business."[164]

(i) Insolvency: Connected Wireless has claimed multiple times to be insolvent after transferring assets to C&C. It represented on November 1, 2017, that it had no more assets.[165] Connected Wireless's February 2019 bankruptcy petition claimed it had no "cash or cash equivalents,"[166] and Morrison represented again on August 12, 2019, that it was a "defunct company."[167]

(j) Timing: Morrison signed a March 1, 2015 Bill of Sale on Connected Wireless's behalf with C&C eleven days after Connected Wireless received a letter from the UALD indicating that the EEOC requested transfer of the discrimination investigation to their office.[168] Connected

---

[161] *See* Docket No. 91-14.

[162] *See* Docket No. 92-7, at 2.

[163] *Id.* ("Connected Wireless . . . hereby sells, transfers and conveys to C&C . . . all Assets of Connected Wireless . . . as described in more detail in the Purchase Agreement.").

[164] Docket No. 92-2, at 3 (Letter from Connected Wireless counsel to Plaintiff, dated November 1, 2017, stating Connected Wireless sold all assets in March 2015).

[165] *See id.*

[166] Docket No. 91-15, at 6.

[167] Docket No. 71-1, at 2 (email correspondence from Morrison to Plaintiff's counsel).

[168] *See* Docket No. 92-7, at 2 (Bill of Sale, dated March 1, 2015); Docket No. 92-14, at 2 (Letter from UALD to Brian Rhay at Connected Wireless, dated February 18, 2015).

Wireless was previously aware of the discrimination charge,[169] and its conduct supports Plaintiff's assertion that Connected Wireless quickly sold assets after seeing the legal case escalate.

The Court finds the evidence available under these factors shows subversive motive. The UFTA requires only that a debtor have intent to hinder or delay, not necessarily intent to defraud. "This distinction is important because while fraud requires an intention to deceive a party, hindrance or delay simply require an intention to put off payment."[170] The evidence above establishes, by a preponderance of the evidence, that Connected Wireless's 2015 transfer of assets was conducted with intent to put off payment.

It appears this subversive intent continued after the 2015 asset transfer. As noted previously, on November 1, 2017, Connected Wireless's counsel Leisel Stevens wrote to Plaintiff claiming Connected Wireless had sold all assets.[171] The 2019 bankruptcy petition asserts that Connected Wireless's 2017 gross revenue was only $39,000.[172] However, the trustee in Connected Wireless's later bankruptcy proceedings indicated that "2017 tax returns show over

---

[169] *See* Docket No. 91-14 (documenting the UALD's July 3, 2014 interview with Brian Rhay regarding the discriminatory conduct).

[170] *In re Black Iron, LLC,* 609 B.R. 390, 408 (Bankr. D. Utah 2019). *See* Uniform Voidable Transactions Act § 4 cmt. 8 (Nat'l Conference of Comm'rs on Unif. State Laws, 2016) ("Fraud is not a necessary element of a claim for relief under any of those provisions. By its terms, § 4(a)(1) applies to a transaction that 'hinders' or 'delays' a creditor, even if it does not 'defraud' the creditor. *See, e.g.*, *Shapiro v. Wilgus*, 287 U.S. 348, 354 (1932); *Means v. Dowd*, 128 U.S. 273, 288–89 (1888); *Consove v. Cohen (In re Roco Corp.)*, 701 F.2d 978, 984 (1st Cir. 1983); *Empire Lighting Fixture Co. v. Practical Lighting Fixture Co.*, 20 F.2d 295, 297 (2d Cir. 1927); *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 374 (S.D.N.Y. 2003). "Hinder, delay, or defraud" is best considered to be a single term of art describing a transaction that unacceptably contravenes norms of creditors' rights. Such a transaction need not bear any resemblance to common-law fraud.").

[171] Docket No. 92-2, at 3.

[172] Docket No. 91-15, at 24.

$871,271.00 in gross business income."[173] Less than one month after Plaintiff and Connected Wireless held an unsuccessful settlement conference on January 18, 2018,[174] Morrison signed an Application for Reinstatement for Connected Wireless on February 12, 2018.[175] About one month after that, Morrison instructed Leisel Stevens to withdraw as counsel on March 14, 2018, claiming Connected Wireless "lacks the necessary resources to pay for Counsel's ongoing legal services in connection with this case."[176]

On February 12, 2019, Morrison executed a voluntary petition for Connected Wireless's bankruptcy,[177] staying proceedings in this Court.[178] During bankruptcy proceedings, the trustee learned Morrison transferred significant assets from Connected Wireless for his own use, and the trustee requested documentation from Morrison.[179] Without providing that documentation, Morrison filed a petition to voluntarily dismiss the bankruptcy case on May 24, 2019.[180] He did so through his attorneys W. Earl Webster and James E. Harward—claiming "the filing of a Chapter 7 bankruptcy petition was an error" and that "as of the date of this petition, Debtor owes no debts to any creditors."[181] That same day, Morrison signed a notice of termination of counsel directing his attorneys Webster and Harward to withdraw from representation.[182] On August 12,

---

[173] Docket No. 92-1, at 2.

[174] *See* Docket No. 25 (Settlement Conference Report).

[175] Docket No. 92-3, at 3.

[176] Docket No. 26.

[177] Docket No. 91-15, at 5.

[178] *See* Docket No. 56.

[179] *See* Docket No. 92-1, at 2–3.

[180] Docket No. 92, at 2–3.

[181] *Id.*; Docket No. 92-1, at 3 ("As of the date of the debtor's petition to dismiss and this objection, the debtor has failed to produce any information or documents or matters requested in writing except for certain documents related to the ADA litigation.").

[182] Docket Nos. 64-1, 65-1.

2019, Morrison emailed Plaintiff's counsel claiming "Connected Wireless is a defunct company," and therefore, "mediation would be a waste of everyone's time."[183] Neither Plaintiff nor the Court has since heard from Connected Wireless.

The Court finds that Connected Wireless had actual intent to hinder or delay Plaintiff from obtaining relief. Under the UFTA, this renders the asset transfer from Connected Wireless to C&C fraudulent. Therefore, exception (4) to the general rule regarding successor corporations applies,[184] and Connected Wireless's liability can be imputed to C&C under this theory.

      c. *There is insufficient evidence to establish that C&C explicitly or impliedly agreed to assume Connected Wireless's debts.*

Regarding exception (1), Plaintiff argues C&C is liable for damages in the present case because it expressly agreed to take on Connected Wireless's liabilities.[185] The Court is not convinced this theory of liability applies. Plaintiff points to the Assignment, Assumption and Consent Agreement, made between Connected Wireless, C&C, and Sprint.[186] This agreement assigns "assets and liabilities of Connected Wireless arising from or in connection with the [July 9, 2014] [Authorized Representative] Agreement" between Connected Wireless and Sprint to C&C as of April 1, 2015.[187] It does not saddle C&C with liabilities arising before July 9, 2014, when the original AR Agreement became effective.[188] The discriminatory conduct at issue

---

[183] Docket No. 71-1, at 2.

[184] *See Trujillo*, 694 F.2d at 224.

[185] Docket No. 91, at 28–29.

[186] Docket No. 92-8, at 2.

[187] *Id.* (defining "Effective Date" as April 1, 2015).

[188] *See id.* at 4, 24 (defining "Effective Date" as "the date the last Party signs this Agreement." Connected Wireless' representative signed on July 7, 2014, and Sprint Solutions' representative signed on July 9, 2014.).

occurred around March 19, 2013, when Plaintiff was constructively terminated from employment with Connected Wireless.[189]

Nonetheless, the Court has found C&C liable under both the "substantial continuity" and fraudulent transfer theories of successor liability.

2.   <u>Morrison is Individually Liable as Connected Wireless's Alter Ego</u>

According to Utah's alter ego doctrine,

the trial court may "disregard the corporate entity" and hold an individual liable if: (1) there is "such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, viz., the corporation is, in fact, the alter ego of one or a few individuals;" and (2) "the observance of the corporate form would sanction a fraud, promote injustice, or an inequitable result would follow."[190]

Plaintiff points to Connected Wireless's February 2019 bankruptcy petition as evidence for the "unity" requirement above.[191] It lists Morrison as President and shareholder, holding a 100% interest in the debtor company, Connected Wireless.[192] This suggests his interests are fully aligned with those of the corporation. Further, the trustee in Connected Wireless's bankruptcy proceedings indicated:

It is believed that the debtor entity [Connected Wireless] has continued to incur debt and made transfers and incurred debt in funding the operations of HAM Enterprises, the construction company of Anthony J. [Morrison], the principal of the debtor. So far the Trustee has learned of the transfer of no less than $17,000.00 of American Express credit incurred by the debtor and transferred to Mr. [Morrison] or HAM Enterprises.

The Trustee also learned of transfers of real property, including sale of the Highland Drive property and a home. The Trustee has requested copies of the closing statements for those sales, as well as made written request for financial account statements from January 1, 2016 to March 5, 2019, identification of all transfers in

---

[189] Docket No. 72-1, at 2.

[190] *Macris & Assoc., Inc. v. Neways, Inc.*, 60 P.3d 1176, 1181, 2002 UT App 406, ¶ 21 (quoting *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979)).

[191] Docket No. 91-15.

[192] *Id.* at 34.

the last four years, copies of the ADA litigation pleadings and claims against the debtor, and turnover of $17,861.00. As of the date of the debtor's petition to dismiss and this objection, the debtor has failed to produce any information or documents or matters requested in writing except for certain documents related to the ADA litigation.[193]

The Court has uncontested evidence that Morrison held a 100% interest in Connected Wireless as of February 2019 and that he used corporate assets for his personal gain, including funding his construction company, HAM Enterprises.[194] Observing the corporate form in this situation would "sanction a fraud, promote injustice, or an inequitable result would follow."[195] Therefore, the corporate entity must be disregarded and Morrison held personally liable.

## III. CONCLUSION

It is therefore

ORDERED that Connected Wireless, Inc., C&C Communications, LLC, and Anthony Morrison are jointly and severally liable for damages to Plaintiff in the amount of $250,379.80. This sum consists of $97,841.30 in back pay, $50,000 in compensatory damages, and $102,538.50 in attorney fees.

DATED this 16th day of November 2020.


BY THE COURT:


_____
Ted Stewart
United States District Judge


---

[193] Docket No. 92-1, at 3. Trustee erroneously refers to Morrison as "Anthony J. Morris."

[194] Docket No. 91-15, at 34; Docket No. 92-1, at 3.

[195] *Macris*, 60 P.3d at 1181.

30